May it please the Court. My name is Jennifer Jill Bacon. I'm a lawyer from Kansas City. I represent plaintiffs in the four state class action cases here. With me at counsel table are Tom Brill from the Farmland case, my co-counsel Bob Gagios, who represents the State of Wisconsin along with us. If there are specific questions about either Farmland or the Wisconsin-specific issues, I'll be deferring to them. Otherwise, I'll be arguing the case on behalf of the plaintiffs. I represent here a group of plaintiffs. They all share many characteristics in common. Most importantly here, these are business, industry, commercial customers, all of whom we're suing for antitrust violations, for the sale of natural gas in a fact pattern that may be familiar to many of you, the various cases and situations that arose in the early part of the 2000s involving the widespread and really across the country manipulation of natural gas markets. Three years ago Your plaintiffs are retail buyers for consumption? Entirely. Only retail buyers for consumption. These are all people who bought for their own use only, which, as you've probably read in our briefs, makes these sales completely exempt from Federal regulation. In spite of that, the district court in Nevada two years ago issued an opinion, three years ago it issued an opinion reconsidering its previous orders on preemption, finding implied preemption. Then it was about 18 months ago when the court issued its final opinion, which is now on appeal. This case cannot be a preemption case. This decision is at odds with the plain language of the statute. Sixty years, sixty, of consistent Federal jurisprudence, the statements of FERC itself about this exact situation, the Gallo case decided by this court four years ago, five years ago now, and just plain common sense. The NGA is a very unusual statute. It has a traditional grant of authority contained in Section 1B of that Act, also called Section 717B. That's not the unusual part. The unusual part is, unlike any other statute with which I am familiar, the NGA contains an express prohibition against Federal involvement in anything other than the subjects of its authority. Can I jump in with a question? Oh, yes, you may. So do you accept their general proposition that once something is within FERC's jurisdiction, only FERC can address that particular subject? I think that is open to question. I believe it actually is. That's not our case, because we have something that isn't subject to FERC's jurisdiction. But there are instances of kind of what you define as the subject, right? Because if the subject is the practices that went into composing these indexes, I think you'd have to concede that FERC does have jurisdiction to regulate those practices as they affect jurisdictional rights, right? I do believe that FERC cannot regulate the practices. They can regulate, they can say to the companies engaged in those types of sales, they can say to those companies engaged in those sales that they can do, not do, they can regulate their behavior in those sales. But the exact same companies engaged in precisely the same behavior, honestly, in sales that are not jurisdictional, sales that are not sales for resale, may not be regulated by FERC, and that's what the cases say and that's what they say. Help me understand, then, the nature of these indexes, because what you just described is inconsistent with my understanding of how they work. As I understand it, all sorts of transactions get reported into these indexes, jurisdictional, non-jurisdictional transactions. Both can be reported, yes. Right. And once you, once they're in there, they just produce a number that everybody then uses to price transactions going forward, right? So if FERC can regulate those practices that go into composing the indexes as they affect jurisdictional sales, how can you, how could you separate that from the regulation of the practices as they affect non-jurisdictional sales? Because they are, in fact, individual reports. These companies, they're not, it's not a blob of things. First of all, they're voluntary, entirely voluntary. Nobody has to make any reports. They did, and I do believe at times they probably included some jurisdictional sales. That's a very tiny part of the market today, but they may have included a few. So those reports are, the reports are voluntary. The decision to make jurisdictional sales, and as I said, that's a small number today, that's a voluntary decision by these defendants. Those sales themselves, and the record will show, are almost exclusively sales between the defendants that are sales for resale. They're not sales to customers. They're sales between themselves. Then they have to choose to report them to the indices. The indices are completely private and unregulable by FERC. And then somebody has to choose to price a sale at an index. The folks we represent, the major industrial and commercial customers, of course, are looking for some kind of a reference point for pricing. For these folks to choose to price at an index, this very sophisticated group of defendants who are in this business and really only in this business to choose to price at an index is another voluntary decision. It seems to me, to me, that FERC has, and they've said this, they've said it about the Code of Conduct, they've said it about their blanket marketing certificates, these virtual sort of authority that were given to these parties to do all their jurisdictional transactions at market rate. FERC has said all we can regulate with the Code of Conduct, with our blanket marketing certificates, with our very limited jurisdiction are sales for resale. So when they are reporting a sale for resale, it's regulated by FERC, that FERC cannot go outside those boundaries. And they've said it over and over. Sales for resales are using the indexes as the pricing mechanism, right? Every once in a while. Okay. Well, however often it is. There are circumstances in which those indexes are influencing or affecting the prices in jurisdictional transactions, right? Yes, but you can separate those. You can look at the impact, you can look at the impact of the false reporting alone. You can do that. This is something that bothered me. I don't mean to stop your questioning. But the, you, your people bought upstream from the first sales, correct? No. You were all first sales? Yes. Oh, yes. We have no wholesale sales in any of our complaint. Zero. You didn't buy from any wholesale? No. Just those first sales? All direct. All direct. That's what much of what happened in the last few decades has done. It has enabled people who are consuming for their own use to buy directly, to buy directly from the producers. And by the way, it's not just gas producers here in this country. Farmland Industries bought hundreds of millions of dollars of foreign gas. There's processing plant gas. But all of those, all of those are outside of our jurisdiction. So because under the statute, FERC has no control over the wellhead prices. Correct. As well as the first sales. Right. FERC is essentially removed. Removed. In your particular theory, FERC is removed from the whole process. No, it's not. I would not call that a theory. That's a fact. FERC is removed. They no longer have any authority to touch any of that, and that's all that we're talking about here. But they do, and could, I suppose, go to these companies when they're selling to each other back and forth and say, you can't report anymore to indices, or you can't price your sales at index, or they could say things like that to them, but they can't say anything, not one thing, about their reporting of non-jurisdictional transactions, nothing. They can't regulate that at all. Not at all. Nor can they regulate the indices themselves. So there's very few jurisdictional sales that exist. I guess you say very few jurisdictional sales exist. It's a complete reversal. FERC still has control over those. So, essentially, if you interpret practices, the word practices, consistent with the way the defendants interpret the word practices, essentially, FERC comes back and takes control of the market again because anything impacts the price of the jurisdictional sales. Is that? That's exactly right, and that's why. And by the way, I understand that the word practices can be a very big word. Contracts can, too. There's two or three words in there. They can all be really big if they're read in isolation, which is what, of course, the defendants would like this Court to do, to read it in isolation. Just look at those words. They're big words. But that's not the way they're read. There's an entire statute here, and it's an extraordinarily specific statute. It says here's FERC's sales for resale. Here's everything else. And the Panhandle case in 47 goes on at length about this exact issue, this exact issue of what about direct sales for consumptive use. And they say in almost Fourth of July language, it's the State's province, it's always been the State's province, nothing about this Act is intended to intrude, modify, affect it in any way, in any way. And that's been the consistent jurisprudence in this country now for over 60 years, almost 65. Let me ask you this. So let's say that a particular practice that FERC is interested in has an effect on both jurisdictional and non-jurisdictional sales, right? That's the allegation here. And let's say that some challenge to the legality or validity of that practice were made, and FERC investigated, looked at it, and said, no, you know what? In fact, this practice is just fine, and we have the authority to do that, to make that determination because it's affecting jurisdictional sales. You think that State courts could come in in the context of non-jurisdictional sales and make determinations that were completely at odds with what FERC had determined? If FERC were looking at jurisdictional sales, I think courts could come in and look at non-jurisdictional sales. Absolutely. That's the dual regulatory scheme established by this statute upheld consistently. And by the way, these are not the first people to make this argument. The American gas case in 1990 is exactly the same case. They used the same little phrase out of the rate-making statute. Out of the rate-making statute, not the jurisdictional portion of the statute, but the procedures for establishing rates. They used affecting, not practices, but contracts. Same litany of words. And the argument was exactly the same. There are all these non-jurisdictional contracts these days as markets were opening up, et cetera. And the terms of those contracts, which were in many cases identical to the terms of jurisdictional contracts, those terms are affecting your jurisdictional contract authority. And you need to get in here and change it. And FERC said, no, we're not going to do that. And the Court said, that's right. The language of Section 5, the rate-making statute, cannot trump the language of Section 1, the jurisdictional statute. The same result was reached in Conoco v. FERC, a Fifth Circuit case. By the way, I might just point out in passing, the D.C. Circuit and the Fifth Circuit get most of these, maybe the Tenth Circuit, these NGA cases. Obviously, the D.C. Circuit, because they're where the agency is, and the Fifth Circuit, and to a certain extent the Tenth Circuit, because they're where the gas production is going on. So anyway, same argument made in Conoco. The argument was using a different little bit of that statute in connection with. We can reach things in connection with. This time it was FERC arguing. We get to reach that because it's in connection with what we do. And we need to be able to regulate that because it's important to us to regulate things over in this other area because it's in connection with what we do regulate. And the argument was no.  I have a few questions about the concept of preemption. I'm thinking of Justice Scalia's comment about if the Federal government becomes involved, that's to the exclusion of the State government. And the State government should in no way occupy the same field. Correct. Field preemption, obviously. So the question is here, if FERC gets involved in a jurisdictional sales issue, which also involves non-jurisdictional sales issues, and if you have this concept that you can't have dual sovereignty or dual involvement, that once the Feds are involved, then the State can no longer be involved, how does that impact your argument? Two things. First, in this area, this NGA, there is a specific regulation, recognition, excuse me, that it is in fact a dual regulatory field. That's the specific regulation or recognition, started in panhandle, continued consistently throughout. FERC can handle behavior regarding jurisdictional sales. Everything else they can't touch. That is exactly how it works. It is precisely the way it works. And by the way, it has been recognized on occasion to be somewhat awkward. It is not necessarily easy. Here, of course, there is no impediment. Here, we're not regulating anything that FERC was involved in. The few cases that are cited by the defense here, the appellees, involve instances where FERC had come in, announced what it was going to do, and the States, usually through regulatory commissions, were coming in and saying, we're going to change that, we're going to redo your decision, FERC, we're going to modify that. We have nothing like that here. Now, I'm not saying that FERC wasn't regulating, hadn't been regulating, didn't claim jurisdiction, had never had jurisdiction to deal with these behaviors, never, none of it. They passed this Code of Conduct in 2003, which contains a lot of Moses-from-the- mountain kind of language, but it was quickly, a lot of people put their hand up and said, wait a minute, what about your jurisdiction? And they issued a series of orders in 2004, most of which are cited in our brief, that say, no, no, no, we have no jurisdiction over any of that. We're just sales for resale. And the blanket certificates and the Code of Conduct and all those things only apply to our jurisdiction for sales for resale. And in other orders where people are saying, well, isn't this going to create something inconsistent here? We've got something they say, well, that's our, that's, that's the deal. We can do what we can do with the sales for resale market, that's it. And that issue, that's the fundamental dispute, because, between you and the defendants, because they basically say there is no such limitation. The Code of Conduct is a clear representation on the part of FERC that they've got exclusive control over this issue. And what you're saying is there's that language in 2004 which says, oh, no, we don't, we don't deal with non-jurisdictional issues. Yes, that's exactly right. The Code of Conduct is silent as to its jurisdictional underpinnings. It doesn't say anything about that. In 2004, with specific reference to this Code of Conduct, these blanket marketing certificates and their jurisdiction, in this order, FERC 61072 issued in 2004, has a specific preface that says this order benefits the public because it explains the scope of the Commission's jurisdiction over gas sales, and then goes on to discuss the fact that it's only a limited jurisdiction over sales for resale, and that the blanket market certificates don't give them any more jurisdiction, and that the Code of Conduct doesn't give them any more jurisdiction, doesn't enhance their jurisdiction in any way. I mean, FERC has on occasion tried to make this argument, not here, never here, but they did try to do it in the Conoco case, where the Fifth Circuit said, no, your ability, you can't act over non-jurisdictional matters if they're just in connection with. Nothing in NGA 4, 5, and 7, kind of the procedural bits of the FERC regulation, nothing can trump Section 1B jurisdiction, which is clear, bright line, and a very definite field that you can't operate in. Ms. Bacon, do you wish to reserve any time for one more? You know, I do. I better be quiet right now. I'm sorry, Your Honor. I didn't mean to sit you down, but... Thank you. May it please the Court. My name is Mark Haddad from Sidley, Austin. I represent the CMS defendants. I'm going to speak this morning on behalf of all of the defendants on the preemption issues. Were the Court to have any questions about the personal jurisdiction issue unique to AEP, then Mr. Walensky would address the Court's questions on that. I'd like to begin by being very clear about the distinction between field preemption and conflict preemption. Many of the Court's questions this morning go to that, and I think that's critical. Our defense is one of field preemption, and the distinction between field and conflict preemption is that in conflict preemption, the Court may still ask whether the State law can supplement the Federal law without creating a conflict. In field preemption, the inquiry is fundamentally different. The inquiry is first define the Federal field and then ask does the State law intrude upon that field. If the State law does intrude upon that field, then it's preempted and the inquiry is over. So you would define the field here as what? We would define the field as the field of practices that affect the reasonableness of the rates in jurisdictional sales. That, by natural gas companies, that flows directly out of the plain language of the Natural Gas Act of 1938, particularly out of Section 1B and Section 5. And I want to just touch on that plain language because while counsel for the appellants said that our theory is inconsistent with the plain language, counsel didn't address the plain language. And the plain language squarely supports the establishment of this field. If the Court looks, first of all, at Section 1B, the Court will see that Section 1B defines the Federal field to include transactions involving transportation and interstate commerce and sales for resale. And, third, it extends jurisdiction to natural gas companies engaged in such transportation or sale. And if the Court looks at the Panhandle Eastern case on which plaintiffs so heavily rely, at page 516, the Supreme Court is very clear to say that the Natural Gas Act gives the Federal field to three things and three things only. And the third of those three things is jurisdiction over natural gas companies. Now, FERC does not have today jurisdiction over everything a natural gas company does. But Section 5 tells us what aspects of the conduct of a natural gas company FERC does have jurisdiction over. And that includes, in the language of Section 5A, the authority to determine whether any, quote, rule, regulation, practice, or contract is unjust or unreasonable. As it affects jurisdictional rates. As it affects jurisdictional rates. Here, obviously, we're not dealing with anything having to do with jurisdictional rates. Okay. Well, and I would respectfully disagree. And let me explain why. Because what FERC investigated and concluded in 2003 was that the practice of reporting the price of sales, whether they were jurisdictional sales or non-jurisdictional sales, the price, the practice of reporting the prices of those sales to these jurisdictional sales was a practice that had been improper, unreasonable, required correction. And FERC, in fact, took two corrective actions. One, it revoked the Blanket Market Certificate of Enron in the Enron Order in 2003, July of 2003. And then second, it promulgated a Code of Conduct where it said to other energy traders, over which it had jurisdiction, we'll revoke your certificates, too, if you don't comply with this Code of Conduct. Now, the critical point that the appellants are missing in their argument is that FERC, to meaningfully regulate the practices of price reporting, has to regulate the reporting on all sales, not just on the jurisdictional sales. Because the sale prices of all sales go into the indices. The indices don't distinguish between jurisdictional sales and non-jurisdictional sales. Wasn't that exactly the point that Judge Ikuda made in Gallo, allowing the plaintiffs in that case the opportunity to prove that the non-jurisdictional sales had affected their prices and, therefore, very difficult to do, she said, but they have an opportunity to do that? That's exactly what she said they could do for purposes of a Sherman Act claim and to avoid the filed-rate doctrine. That's correct, Your Honor. And that's what they're trying to do here. Right. But that's not what they're trying to do here. Why is it different? Well, they're doing two different things. Let me start with the less important but worth noting and then the more important. Here they're pursuing, for the most part, full consideration damages. This is the have your cake and eat it too damages where you get to keep all the gas and you get all the money back that you paid for it. So that's a great cause of action. If you can sustain it, it's available under some four of the five states' laws. Now, so that gets them out of the problem that Judge Ikuda pointed out in footnote 13 of Gallo of having to trace their sales back. But second, and the more important point, is that in Gallo, all the court was considering was a filed-rate doctrine defense. And for that defense to work, the defendants had to show that FERC had approved all of the rates in these indices. And the court found you couldn't, defendants, you can't show that. You can't show it because the allegations are that some of these rates were, in fact, false and therefore FERC wouldn't approve a false rate. That's on page 1045 of the opinion. So clearly an index composed of false rates wouldn't have filed-rate protection. Some of the rates were first sales and those aren't rates that FERC ever gets to approve. So again, the indices were composed of rates. That was a position Ms. Bacon took, that these are all first sales and therefore you may have common ground and we can save a lot of time. Now, there's where it's very important to distinguish factually an assertion she made from the record in this case. Ms. Bacon and the brief on the other side has asserted that there were very few and negligible amount of jurisdictional sales that were reported to the indices. That conflicts directly with the record. There's no support for that in the record. Let me direct the court to the parts of the record that refute that. Gallo itself, at pages 1031 to 1032, and at page 1045, citing the FERC investigation, itself observed that many jurisdictional sales were reported. And if you look at our brief at page 9 and footnote 3, we've collected relevant authorities on this. And finally, and most tellingly, if you look at Judge Proh's order at the excerpts of record page 43 and footnote 19, you'll see that he cites not only FERC's own findings, but the evidentiary record that the defendants established in this very case. That's unrebutted. But as I understand your argument, it doesn't matter as long as there are some jurisdictional sales that are reported into these indexes. That's all that counts, right? Well, I would agree with that, Your Honor. But I think that it's critical to see for the reasonableness of FERC's exercise of jurisdiction over all the price reporting, it had to have the ability to go after all the price reporting because many jurisdictional sales were being priced at index. That's, I guess, the biggest problem I have with your argument, though, because I don't see the need for FERC to have this exclusive jurisdiction in terms of regulating the indexes. It can do whatever it wants as it affects jurisdictional sales, and the plaintiffs aren't challenging FERC's authority to do that. But once we're in the realm of non-jurisdictional sales, it seems to me state courts can announce whatever rules they want with respect to the manipulative conduct that was going on in the indexes. Why does FERC have to have to occupy that whole field for it to be effective? Well, two responses. First of all, the practices that are being attacked here are the practices of the reporting of prices to the indices. FERC has jurisdiction over those practices. It had to. If they're jurisdictional sales, but not as a non-jurisdictional sales. No, even if they are, if the Court would look again at pages 17 to 18 of our brief, we give an example that I think illustrates well why it is that the reporting of a non-jurisdictional sale is something that affects the ultimate price of a jurisdictional sale. And the reason is that the indices don't distinguish between the price reports of a jurisdictional sale and a non-jurisdictional sale. No one can tell when a price report goes in what later sale it's going to affect. It's going to go into an index. Well, that might be true, but Congress knew that, and Congress said you can't regulate non-jurisdictional sales. And the practices involved in non-jurisdictional sales. But, Judge Bea, here FERC is not regulating jurisdictional and non-jurisdictional sales. It's regulating the practice of how price reporting goes into indices. That's the field. It's regulating the practice of price reporting. And that's really critical to understand why this is a valid preemption argument. But the problem, when you change the focus to practice, which, by the way, it seemed to me that you did not argue initially, Judge Proh initially denied the dismissal. Then you brought up this argument involving practice, and then he reversed his decision. But if, in fact, you are focusing on the word practice, it essentially means that you are taking over both, or FERC would be taking over both jurisdictional and non-jurisdictional sales. You basically can't make a distinction. So when we are trying to assess what Congress meant, don't we try to figure out how you could interpret this particular provision? That's 1B, and also 5, in a way that is consistent, that makes everything that they are intending to do, Congress is intending to do, justify. And the most logical way of doing that would be to focus on jurisdictional versus non-jurisdictional sales, because that's all in 1B. And then adjusting the word practice to be consistent with that, but not focusing on practice, because if you do that, the whole distinction between jurisdictional and non-jurisdictional sales becomes irrelevant. Here's my response, Your Honor, to that important question. It's only the first two parts of 1B that focus on transactions. The third part of 1B focuses on natural gas companies and gives FERC regulation over the company's conduct. And in turn, Section 5 narrows the scope of that authority over the company's to certain kinds of conduct, and that conduct includes the practices of companies as they affect the reasonableness of rates. Now, it's the reasonableness of rates of jurisdictional sales, but here, false price reporting on non-jurisdictional sales directly affects the reasonableness of the price of jurisdictional sales. So we have a situation where we have a direct effect on jurisdictional sales by the practice at issue. Now, in both the Schneiderwin case and the Mississippi Power and Light case, where you have an impact on non-jurisdictional sales from FERC regulating in its area, it's FERC's regulation and you have field preemption. And let's look at Schneiderwin, for example. Because there, it's voluntary conduct. It's A&R Pipeline wanting to issue stock. That's a voluntary decision. It's Michigan saying, well, you're a Michigan company. We get to decide whether you issue stock or not. And there's no preapproval process that the NGA gives to FERC, like Michigan had. But nevertheless, the Supreme Court strikes that down because FERC has the power, including through its certification authority, to decide if the company's practices with regard to such things as the issuance of stock are imprudent, and it can address the concerns of ratepayers in Michigan, which is what Michigan was trying to protect, too. Now, those ratepayer payments are non-jurisdictional transactions. FERC can't usually do anything about what a ratepayer pays to a utility. But in this instance, because of the practices authority that FERC had to address the very same concerns that the Michigan law did, the Court held that this was preempted. Our case is much easier. There's a much more direct impact here than there was in the Schneiderwin case because here FERC actually has taken action within this field. FERC actually has in the blanket order regarding Enron and in its Code of Conduct said, we have authority under Section 5 as well as Section 1 to regulate the price reporting on non-jurisdictional sales. We have to have that authority. Okay. But let's say we accept that. The problem I still have, though, is that we have a case that involves only non-jurisdictional transactions. And to me, what 1B says is that we're going to force courts to take a transactional mode of analysis to analyze these cases. And in this case, because we're solely on the non-jurisdictional side, FERC just doesn't have anything to do with how state courts resolve the underlying claims. But that's what the Mississippi Supreme Court said. And the reason I think that case is different, but just tell me if you think I'm misreading it, is that that's a case in which FERC actually had taken action. No one disputed that it had the authority to set the wholesale rates and the allocation. But it had taken action. And what the state court was trying to do was basically completely undermine the action that FERC had taken. I don't see anything here, especially not in the 2000 to 2002 time period, that FERC did anything that these state court actions, if they're allowed to proceed, would undermine. Well, first of all, my response is that's a conflict preemption mindset, not a field preemption mindset. Secondly, in Mississippi, the whole argument was nothing that FERC did affected the prudence review that the state wanted to carry out. There had never been a prudence examination before FERC. And so all the Mississippi Commission wanted to do was say, okay, we understand the costs that have been allocated. Who's going to pay, the shareholders or the rate payers? And FERC didn't decide that. So we want to decide that. And that's what rate payers pay is not a FERC issue. What the state wanted to change, though, was the allocation that FERC had set. And that's the whole reason why the Supreme Court said you cannot just completely undermine the regulatory action that FERC has taken. But just point to me, what's the regulatory action FERC has taken in this space that you say would be inconsistent with allowing these State court actions to proceed? FERC has decided that all price reporting, whether for jurisdictional or non-jurisdictional sales, must conform to a code of conduct or face the loss of a certification. And FERC has enforced it with regard to one trader. That means the area of price reporting is a FERC area. It's a part of FERC's field. Post-2005? I mean, post the change? No, this is pre because in Order 636, which is back in the 1990s, FERC said we're going to monitor the practices of these companies. And then FERC did so in 2003. It investigated the 2000 and 2001 conduct. And it imposed penalties, including the revocation of a certification. And it changed the rules by adopting a code of conduct. So it responded directly here. Now, in Schneiderwin, the Court makes clear the fact that Congress has not given the Federal Government or FERC every tool that a State may have, such as a full consideration remedy or whatever, has no bearing on whether field preemption applies. And that's critical. Congress is free to change the tools when it wants to. And that's, in fact, what happened, Judge Sessions. In 2005, Congress gave the Federal Government additional tools. But it was not that FERC didn't have tools or wasn't regulating at the time. It was. We know that from the things I've cited. And other Federal agencies had authority to act. The CFTC did. Ms. Bacon responded to that issue about the code of conduct and basically said in 2004, FERC said, oh, no, we're only talking about jurisdictional sales. This is limited. The code of conduct is limited in that kind of way. Do you disagree with that? I do disagree with that. And I would point the Court, for example, to paragraphs 16, where the Court made clear that it had authority, even if it couldn't regulate all sellers in the natural gas market, it still had authority to impose its code of conduct rules on all sellers within its jurisdiction who were engaged in the manipulation of prices. So, again, it's reinforcing that it's regulating natural gas companies under 1B and their practices under Section 5. And it's not limited to jurisdictional sales. And it explained that in paragraph 18. It needed to have the natural, the interstate natural gas market function properly, it explained in paragraph 18. It needs a transparent market where price reporting to the indices is accurate and fair. That's FERC's job to control the price reporting, and it is not limited to just controlling the price reports of jurisdictional sales, because the non-jurisdictional sales affect the prices of jurisdictional sales and the reasonableness. Thank you very much, Mr. Haddad. You've exhausted your time. Ms. Bacon, you have some time left. Thank you. Three things. If I can get this down to my level. Sorry. Three things. Schneiderwind is an interstate pipeline. It's an interstate pipeline. It was the efforts of the State of Michigan to regulate an interstate pipeline. Interstate pipelines are absolutely FERC-regulated entities, period. Two, the Panhandle case directs that sales for resale means it does not reach in any case direct sales. They only are sales for resale. They specifically say that. No question about it. The order from FERC, the purpose of the code of conduct is to ensure the integrity of the market that remains subject to the jurisdiction of the commission. That jurisdiction is quite limited. It's only regulating sales for resale. The cases I've cited already, there is a FERC order in, this was I think 2010, 131 paragraph 61246 in which they acknowledge at paragraphs 57 and 58 that a seller when making a jurisdictional sale is subject to the commission's jurisdiction. When they are doing things that are not in the context of a jurisdictional sale, they're not subject to the commission's jurisdiction. They make that distinction over and over. They've made it throughout this case. This is a very bizarre case in many ways. You understand the defendants have conceded that federal antitrust jurisdiction is just fine. So there's no impediment. This is a complementary sort of thing. The defendants have said, well, too bad. You didn't bring federal claims, so we get off scot-free. One more point. The commission's jurisdiction is 100 percent prospective. It is prospective only. So anything that happened in 2000 and 2002 is not being touched by the commission, cannot be regulated, cannot be solved in any way by anything the commission did in 2003, but that is very clear. Kennedy. How do you meet Mr. Haddad's point that the practice being regulated here by FERC is not the sale of gas on a first sale basis to consumptive users, but the reporting of the prices thereof? Correct. And the reporting of those prices, when mixed with the reporting of the prices from jurisdictional sales, affect the prices of gas in jurisdictional sales, so therefore they should be regulated by the FERC? All FERC can do is tell these companies, when they are making those sales, that they have to quit lying, cheating and stealing. They cannot do those things anymore if they do exactly the same things. Exactly. Including the companies that sell on a first sale basis? Can they say that to them? You can't do wash sales? You can't misreport? They cannot regulate the first sales of these companies. You can't regulate the reports of the first sales of these companies? No. That's the point about the Code of Conduct. So FERC can't tell them, you can't report wash sales or phony sales? They can tell them that only with respect to jurisdictional sales. Okay. Thank you. Only. That's it. That's what these make clear. You're interpreting the word practices as modified or essentially relating only to jurisdictional sales. It is therefore an irrelevant concept when you take it beyond the jurisdictional sales. Correct. And it's not my interpretation. It's the court's interpretation over and over and over again. Otherwise, you reach the result that you alluded to before, which is the word practices swallows up everything else. There is no way, there is no way to modify that word in a way that reconciles the statute. There is no way to do it except as the courts have concluded in Panhandle, in the D.C. Circuit in American Gas, the Fifth Circuit in both Conoco and Texas Pipeline, that's how you maintain the integrity of the statute, by recognizing the jurisdictional line that is announced expressly, the two fields that are expressly announced in the jurisdictional language has to matter to the subsidiary procedural rate-making language that follows. Thank you very much, Ms. Bacon. Thank you, Your Honor. The court thanks both counsel for an extremely well-prepared and lucid presentation. And with that, since the case of Pineda-Orellana v. Holder is submitted on the briefs, the court is adjourned for today and for the week. Thank you. Thank you.
judges: Sessions, Bea, Watford